NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| R. STEVEN CHAYKOWSKY et al., <br><br> Plaintiffs, <br><br> v. <br><br> BRISTOL-MYERS SQUIBB COMPANY et al., <br><br> Defendants. | Civil Action No. 25-1907 (RK) (RLS) <br><br> **OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon a Motion to Remand filed by Plaintiffs R. Steven Chaykowsky, Westside Pacific Estates, Inc., and John Hart ("MTR," ECF No. 81) and three Motions to Dismiss filed by Defendants Bristol-Myers Squibb Company ("BMS"), Jones Lang LaSalle, Inc., Jones Lang LaSalle Americas, Inc., Jones Lang LaSalle Brokerage, Inc., Daniel J. Loughlin, Township of Hopewell, New Jersey, BeOne Medicines U.S. Holdings, LLC, BeOne Medicines U.S. Manufacturing Co., Inc., BeOne Medicines U.S.A., Inc., and BeOne Medicines Hopewell Urban Renewal, LLC (ECF Nos. 72, 73, 74).

Plaintiff R. Steven Chaykowsky ("Chaykowsky") originally filed a seven-count complaint in state court (ECF No. 1-1), which BMS properly removed to this Court based on diversity jurisdiction (ECF No. 1). In time, Plaintiff Chaykowsky amended the complaint to add additional defendants, claims, and, relevant here, two plaintiffs, one of whom destroyed complete diversity among the parties. ("AC," ECF No. 28.) The question before the Court is whether the nondiverse plaintiff—John Hart, a New Jersey resident—should be dismissed to restore subject matter jurisdiction or whether remand of the entire case is proper.

The Court has carefully considered the parties' submissions and resolves the pending Motions without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78 and Local Civil Rule 78.1. For the reasons set forth below, Plaintiffs' Motion to Remand is **GRANTED**, and Defendants' Motions to Dismiss are **DENIED** as moot.

## I.    <u>BACKGROUND</u>[1]

In 2018, Defendant BMS sought to sell a 433-acre property in Hopewell Township, New Jersey, and Plaintiff Chaykowsky sought to buy it. (AC ¶¶ 3–4.) Relevant here, Chaykowsky offered to buy the property as is—i.e., under its then-applicable zoning restrictions—and was willing to pay $25 million in cash to do so. (*Id.* ¶ 4.) The relevant defendants did not accept the offer (or subsequent higher offers), instead telling Township officials that no offers had been made and the property would need to be rezoned to attract buyers. (*Id.* ¶ 6.) As described below, an ordinance was eventually passed that rezoned the property in ways that allegedly benefited Defendants. (*Id.* ¶ 7.) This dispute followed.

Before turning to Plaintiffs' claims and allegations in greater detail, the Court summarizes the three Plaintiffs and ten named Defendants who are party to this case.[2] Plaintiffs are Chaykowsky, a member of the investor group that sought to purchase the at-issue property; Westside Pacific Estates, Inc. ("Westside"), which represented Chaykowsky and his investor group in their attempts to purchase the property; and John Hart ("Hart"), a lifelong Hopewell resident and Township Committee member. (*Id.* ¶¶ 4, 9.) The original, since-superseded complaint

---

[1] In ruling on the pending Motions, the Court accepts Plaintiffs' well-pled factual allegations as true and presents them as such herein. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (motion to dismiss); *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987) (motion to remand).

[2] An eleventh Defendant—Bruce Mayer, a BMS official—was added in the AC then voluntarily dismissed less than a month later. (AC; ECF No. 47.) In addition to the ten remaining named Defendants, Plaintiffs sue "John Does 1–10" and "ABC Companies 1–10." (AC; *see also* ECF No. 1-1.)

was brought by only Chaykowsky, and the latter two Plaintiffs—Westside and Hart—were added via amendment. (*See* ECF No. 1-1; AC.) Defendants are BMS, which owned and sold the at-issue property; JLL,[3] and more specifically its vice-chairman Daniel J. Loughlin ("Loughlin"), which served as the licensed broker for the BMS property; BeOne,[4] which operates a biologics manufacturing facility on a portion of the at-issue property; and Hopewell Township ("Hopewell" or "the Township"), which passed the allegedly unlawful ordinance. (AC ¶¶ 3–4, 7, 24, 29.) BMS, Hopewell, and two of the three JLL Defendants were named in the initial complaint; Loughlin, BeOne, and one JLL Defendant were added via Plaintiffs' amendment. (*See* ECF No. 1-1; AC.) Plaintiff Hart is a citizen of New Jersey, as are Defendants Hopewell Township, BMS, and Loughlin. (AC ¶¶ 18–20, 24.)

## A. WESTSIDE'S INITIAL OFFER TO PURCHASE THE PROPERTY

Around 2018, Defendant JLL began marketing for sale Defendant BMS's 433-acre research campus located at 311 Pennington Rocky Hill Road in Hopewell (the "Property"). (*Id.* ¶ 32.) The Property sat in "a sensitive environmental area" known as the Central Delaware River Watershed and was surrounded by organic farming and environmental children's educational camps. (*Id.* ¶ 35.) It was thus zoned "RO-1"—that is, designated for single-owner research or office use only. (*Id.* ¶¶ 34–35.) Multiple owners, and land uses such as manufacturing and assembly, were not permitted under this zoning restriction. (*Id.* ¶ 34.)

A group of investors, which included Plaintiff Chaykowsky, made an offer on the Property. (*Id.* ¶ 36.) On December 21, 2018, the group's representative Plaintiff Westside submitted to JLL

---

[3] "JLL" refers to three Defendants—Jones Lang LaSalle Incorporated, Jones Lang LaSalle Americas, Inc., and Jones Lang LaSalle Brokerage, Inc.—collectively. (AC ¶¶ 22–23.)

[4] "BeOne" refers to four Defendants—BeOne Medicines U.S. Holdings, LLC, BeOne Medicines U.S. Manufacturing Co., Inc., BeOne Medicines U.S.A., Inc., and BeOne Medicines Hopewell Urban Renewal, LLC—collectively. (AC ¶ 29; *see id.* ¶¶ 25–28.)

a Letter of Intent to purchase the Property for $25 million in cash, with proof of funds and without the need for financing. (*Id.*) Westside explained to JLL that the investor group intended to purchase the Property through a new company to be formed ("NEWCO") in which Chaykowsky would have an ownership interest. (*Id.* ¶ 37.) Significant here, the group's intended uses of the Property— including holding it as an asset as it increased in value and developing and expanding its research and development facilities—did not require any rezoning of the Property. (*Id.* ¶¶ 38–39.) Westside and Chaykowsky made this clear to JLL and BMS. (*Id.* ¶ 39.) JLL and BMS did not accept the investor group's offer. (*Id.* ¶ 41.)

### B.    THE ORDINANCE

Despite the offer from Westside and Chaykowsky, JLL and BMS "repeatedly misrepresented" to Hopewell officials that no offer had been made to purchase the Property under then-applicable zoning restrictions and that the Property would need to be rezoned to attract buyers. (*Id.* ¶ 42.) Based on those representations, the Hopewell Township Committee drafted a new ordinance, Ordinance No. 19-1716 (the "Ordinance"), to amend the provisions of Hopewell's Land Use and Development Ordinance governing RO-1 zones. (*Id.* ¶¶ 44–48.) The Ordinance, which was proposed at a June 3, 2019 Hopewell Township Committee meeting, expanded the conditional uses of properties within RO-1 zones to include multiple owners of subdivided parcels and manufacturing and assembly in the fields of medicine, pharmacology, and biologics.[5] (*Id.* ¶¶ 46, 48–49.)

The Hopewell Planning Board held a special meeting on June 12, 2019 to determine whether the Ordinance was consistent with Hopewell's Master Plan. (*Id.* ¶¶ 52–53.) Members of

---

[5] The Ordinance also permitted multiple owners operating under a condominium association and contained provisions regarding storage of waste on the Property, lot, yard, height, and coverage requirements, and potential traffic increase. (AC ¶¶ 48, 50–51.)

the public raised concerns about potential adverse environmental impacts of the proposed rezoning. (*Id.* ¶¶ 61–64.) The Township Planner urged that the Ordinance was necessary for the Property to be sold, as no purchase offer had been made under the existing RO-1 zoning restrictions and no such offer was "on the horizon." (*Id.* ¶¶ 57–59.) The Planning Board concluded that the Ordinance was inconsistent with the Township's Master Plan and would disrupt the "essential character that the zone was designed to create," with "potential impacts to the rural residential character that prevails in the neighborhoods surrounding BMS, particularly traffic." (*Id.* ¶¶ 55–56; *see id.* ¶¶ 53–56.) Yet the Board voted to recommend the passage of the Ordinance, purportedly due to the Township Planner's "repeated[]" statements and BMS and JLL's "ongoing misrepresentations." (*Id.* ¶¶ 57–58.)

On June 24, 2019, the Hopewell Township Committee held a meeting to consider final adoption of the Ordinance. (*Id.* ¶ 65.) At the start of the meeting, Hopewell's Mayor gave an "impassioned" speech that the Ordinance needed to be passed to attract a buyer for the Property and that, without a buyer, Hopewell ran the risk that BMS would abandon the Property and the Township would lose significant tax ratables. (*Id.* ¶¶ 66–68.) Although the Mayor had communicated with Chaykowsky prior, she did not mention that she was aware of an outstanding offer from a buyer that would not require a rezoning. (*Id.* ¶¶ 43, 68.) Following the Mayor's speech, members of the public, including representatives from environmental organizations, took turns voicing concerns about the Ordinance, including about pollution, water quality, traffic, biodiversity, and other health, safety, and quality of life concerns. (*Id.* ¶¶ 70–73.) Plaintiff Hart, a lifelong Hopewell resident and Township Committee member, also shared concerns about the Ordinance and expressed his wish that "a single owner for the property" could be found without eliminating the present zoning restrictions on the Property. (*Id.* ¶ 79.) Following the public

5

comment period, BMS and JLL executives—Defendant Loughlin and since-dismissed Defendant Mayer, *see supra* note 2—explained how the rezoning Ordinance was necessary because buyers would only be interested in the Property if it allowed for multiple owners and a broader scope of conditional uses. (*Id.* ¶¶ 75–77.) At no point during the meeting did the Mayor or anyone from BMS or JLL reveal that there was an offer from Westside already on the table that would not require any rezoning. (*Id.* ¶ 79.) Plaintiff Hart thus says he was "deceived" into voting to pass the Ordinance, which was unanimously adopted by the Township Committee at the end of the meeting.[6] (*Id.* ¶¶ 80–81.)

### C.     WESTSIDE'S SUBSEQUENT OFFERS AND THE SALE

Following the passage of the Ordinance, non-party Lincoln Equities Group ("LEG") submitted an offer to JLL to purchase the Property for $37 million. (*Id.* ¶ 84.) When Westside became aware of LEG's offer, it raised its own offer three times, landing at a high of $55 million. (*Id.* ¶ 85.) Rather than accept Westside's higher offers, BMS accepted LEG's offer. (*Id.* ¶ 86.) However, after LEG defaulted on its obligation to close, Westside once again attempted to buy the Property by submitting a renewed offer of $43 million. (*Id.*) BMS instead accepted a renewed offer from LEG to purchase the property for $32 million, which required BMS to provide seller financing (something Westside's offer did not). (*Id.* ¶ 87.)

In 2020, LEG closed on the purchase of the Property and began marketing it for sale or lease. (*Id.* ¶ 88.) In its marketing material, LEG specifically noted that manufacturing activities were now permitted on the Property. (*Id.*) The following year, LEG, using JLL as its broker, sold

---

[6] There was only a minor change from the proposed version of the Ordinance to the final version: Language in the proposed version regarding permissible fields for production and assembly, including "physics, engineering, and similar fields," was removed from the final version as adopted. (AC ¶¶ 49, 81.)

approximately 42 acres of the Property to BeOne,[7] which proceeded to construct and now operate a biologics manufacturing facility on the Property—a use that would have been impermissible under the pre-Ordinance RO-1 zoning. (*Id.* ¶¶ 89–90.)

D.    THE INSTANT LAWSUIT

Approximately five years after BMS's sale of the Property to LEG, Chaykowsky brought the instant lawsuit in the Superior Court of New Jersey, Law Division, Mercer County. (ECF No. 1-1.) Against Defendants Hopewell, BMS, and JLL (along with unnamed John Doe and ABC Company defendants), Chaykowsky alleged a "brazen fraud" perpetrated against himself and the residents of Hopewell, wherein BMS and JLL's misrepresentations regarding the lack of an offer for the Property under the RO-1 zoning restrictions were aimed at "creat[ing] a fraudulent pretext to change [Hopewell's] zoning restrictions, to allow manufacturing and other increased activity on the site that was prohibited by [Hopewell's] Master Plan." (*Id.* ¶¶ 1, 4.) The initial complaint alleged seven state law counts: (i) action to declare the Ordinance void and *ultra vires* pursuant to the New Jersey Declaratory Judgment Act; (ii) action in lieu of prerogative writs to void the Ordinance; (iii) consumer fraud (against JLL only); (iv) aiding and abetting consumer fraud (against BMS only); (v) common law fraud (against BMS and JLL); (vi) civil conspiracy (against BMS and JLL and the unnamed defendants); and (vii) "*prima facie* tort" (against BMS and JLL). (*Id.* ¶¶ 72–102.)

On March 17, 2025, the same day the initial complaint was filed, BMS removed the case to this Court on the basis of diversity jurisdiction. (ECF No. 1.) By April, all Defendants had filed letters seeking a pre-motion conference regarding their intended motions to dismiss the complaint.

---

[7] As a technical matter, the Property was specifically sold to BeOne's parent company, non-party BeiGene Ltd. (AC ¶¶ 89, 93.)

(ECF Nos. 22, 24, 25.) In response to those letters, Chaykowsky's counsel filed a letter representing his intent to "fil[e] an Amended Complaint . . . to address the deficiencies alleged in Defendants' letters." (ECF No. 26 at 1.)

On May 25, 2025, the AC was filed, adding new factual allegations, causes of action, and, most relevant for present purposes, new Plaintiffs and new Defendants. (AC.) Notably, the AC's inclusion of Plaintiff Hart, a New Jersey resident, destroyed complete diversity and, in turn, the basis for this Court's subject matter jurisdiction. (*See id.* ¶ 2 (alleging that Plaintiff Hart is a citizen of New Jersey and that Hopewell and other named Defendants are also citizens of New Jersey); *see also id.* ¶¶ 18–20, 24.) The AC also altered the claims alleged. The AC contains ten counts instead of seven, with four claims brought by all Plaintiffs—(i) action to declare the Ordinance void and *ultra vires* (against Hopewell and BeOne), (ii) action in lieu of prerogative writs to void the Ordinance (against Hopewell and BeOne), (iii) consumer fraud (against JLL), and (iv) civil conspiracy (against BMS and JLL); four brought by Hart (all against BMS and JLL)—(i) fraud, (ii) fraudulent concealment, (iii) equitable fraud, and (iv) negligent misrepresentation/concealment; and two brought by Chaykowsky and Westside (both against BMS and JLL)—(i) tortious interference with prospective economic gain or advantage and (ii) constructive fraud. (*Id.* ¶¶ 91–166.)

Following the filing of the AC, Plaintiffs filed a letter indicating their intent to file a motion to remand the case to state court, given the lack of complete diversity among the parties. (ECF No. 44.) Defendants renewed their requests to file motions to dismiss. (ECF Nos. 38, 43, 45, 64.) After two teleconferences with the Court, (ECF Nos. 66, 69), and consistent with the Court's briefing schedule, (ECF No. 71), the parties filed their respective Motions on September 18, 2025, (ECF Nos. 72, 73, 74, 81). Defendants opposed Plaintiffs' Motion to Remand, ("Opp.," ECF No. 82),

and Plaintiffs replied, ("Reply," ECF No. 83). Plaintiffs also opposed Defendants' Motions to Dismiss, (ECF Nos. 75, 76, 77), and Defendants replied, (ECF Nos. 78, 79, 80).

## II.    LEGAL STANDARD[8]

A defendant may remove from state court to federal court a civil action over which the federal court has original jurisdiction. 28 U.S.C. § 1441(a). If removal jurisdiction is premised upon 28 U.S.C. § 1332, i.e., diversity jurisdiction, complete diversity between the parties is required. *Id.* §§ 1332(a)(1), 1441(b); *Dickson v. Murphy*, 202 F. App'x 578, 581 (3d Cir. 2006). Where, as here, post-removal joinder of a nondiverse party destroys complete diversity, a plaintiff may challenge removal by moving to remand the action to state court for lack of subject matter jurisdiction. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). "Remand is not automatic whenever a nondiverse party is present in the case: Rule 21 empowers courts to police the litigation's cast of characters." *Avenatti v. Fox News Network LLC*, 41 F.4th 125, 130 (3d Cir. 2022). That is, under Rule 21, the Court asks whether it may, and then whether it should, drop a nondiverse party in order to restore diversity jurisdiction. *See id.* at 130–31.

Specifically, the Court must first determine whether the nondiverse party is "required," i.e., "indispensable," within the meaning of Rule 19, such that he *cannot* be dropped from the action and the case must instead be remanded in its entirety for lack of subject matter jurisdiction. *Id.* at 131; *see AC Ocean Walk, LLC, v. Invs. Bancorp, Inc.*, No. 22-6371, 2023 WL 8802531, at *4 (D.N.J. Dec. 20, 2023) ("[A] prerequisite to dropping a party under Rule 21 because the party's

---

[8] The Court starts—and ends—with Plaintiffs' Motion to Remand, and not Defendants' Motions to Dismiss, as the resolution of Plaintiffs' Motion decides whether the Court has jurisdiction over this case. *See Trump Taj Mahal Assocs. v. Costruzioni Aeronautiche Giovanni Agusta, S.p.A.*, 761 F. Supp. 1143, 1148 (D.N.J. 1991) ("Because the motion to remand addresses the subject matter jurisdiction of the court, we turn to it first."), *aff'd*, 958 F.2d 365 (3d Cir. 1992).

citizenship destroys the court's subject-matter jurisdiction over the case, is that the party's presence in the action is not required by Rule 19." (alteration in original) (quoting 7 Wright & Miller's Federal Practice & Procedure § 1685 (3d. ed. 2025))). If the nondiverse party is dispensable, the Court then assesses whether dropping the "spoiler" to restore subject matter jurisdiction would nonetheless cause prejudice to any party. *Avenatti*, 41 F.4th at 130; *see also id.* at 131 ("A district court's Rule 21 authority is discretionary but not unlimited. The court cannot drop indispensable parties, and it must assure itself that its actions will not prejudice any party." (citations omitted)). "If these prerequisites are satisfied," the Court must finally decide whether dropping the nondiverse party is "just," and in making that determination may consider the "*Hensgens* factors" outlined below. *Id.* at 135 (citing *Hensgens v. Deere & Co.*, 833 F.2d 1179 (5th Cir. 1987)); *see* Fed. R. Civ. P. 21 ("Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, *on just terms*, add or drop a party." (emphasis added)).

In short, Plaintiff Hart—the jurisdictional spoiler in this case—may not be dropped, and Plaintiffs' Motion to Remand must be granted, if (1) Hart is an indispensable party, (2) dropping him would prejudice any party, or (3) dropping him is not "just." The removing defendants bear the burden of establishing the Court's subject matter jurisdiction, and "all doubts should be resolved in favor of remand." *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987); *see Avenatti*, 41 F.4th at 130 ("[Courts] interpret the removal statute narrowly, resolving any doubt in favor of the plaintiff's choice of forum in state court.").

## III.    DISCUSSION

The parties do not dispute that the joinder of Plaintiff Hart destroyed the Court's subject matter jurisdiction over this action. Plaintiffs seek to remand and return to New Jersey Superior

Court. (*See* MTR.) Defendants argue that Hart should be dropped from the case to restore complete diversity because he "was improperly and fraudulently joined to this action solely in an effort to defeat the Court's diversity jurisdiction." (Opp. at 1.)

The Court notes at the outset that the doctrine of fraudulent joinder has no direct application to this case. Fraudulent joinder doctrine applies when a defendant removes a state court action despite the absence of complete diversity on the argument that a nondiverse party was joined "solely to defeat diversity jurisdiction." *Avenatti*, 41 F.4th at 133. In other words, the doctrine "is only appropriate in determining the propriety of removal." *Id.* (quoting *Steel Valley Auth.*, 809 F.2d at 1012 n.6). Because this action was properly removed and the diversity-destroying party was added via amendment thereafter, Rule 21 provides the governing framework for Plaintiff's Motion. *Id.* at 132–33 (holding that "[f]raudulent joinder doctrine does not apply to party additions that occur *after* a valid removal" and that courts may consider dropping such parties under Rule 21).

Defendants acknowledge that the three-step Rule 21 framework governs but essentially argue that the Court should begin with the fraudulent joinder question—whether "there is no reasonable basis in fact or colorable ground supporting the claim . . . or no real intention in good faith to prosecute the action," *id.* at 133—and that this question should infuse if not dominate the Court's analysis at each step. (*See, e.g.*, Opp. at 12 (arguing Hart is a dispensable party because he has no colorable claim against Defendants, including that he "can claim no bona fide interest in this matter[,] . . . has alleged no cognizable injury[,] . . . lacks standing to bring any of the fraud claims asserted, . . . [and] has failed to allege any damages [or consumer fraud liability]").)

The Court does not necessarily disagree with the underpinning of Defendants' argument that it would be highly relevant if Hart's joinder was intended to destroy diversity jurisdiction. *See*

*Avenatti*, 41 F.4th at 133–34 ("To be sure, consideration of fraudulent joinder principles might help inform the court's remand decision. . . . '[I]f the defendants can carry the heavy burden of proving fraudulent joinder, that fact should be a factor—and perhaps the dispositive factor—that the court considers in deciding whether a plaintiff may join a nondiverse defendant.'" (alteration in original) (quoting *Mayes v. Rapoport*, 198 F.3d 457, 463 (4th Cir. 1999))). However, for the reasons set forth in detail below, the Court is not sufficiently persuaded that was the intention here. The Court makes this determination at the relevant step—the third and final step of its analysis, only after answering the prerequisite questions of dispensability and prejudice. *See id.* at 129. Further, while fraudulent joinder "principles" may "help inform" the Rule 21 analysis, the Court is not required to opine on or decide the fraudulent joinder question of whether Hart has colorable claims. *Id.* at 133; *see id.* at 134 ("[W]e reject [the] contention that the District Court erred by not conducting a fraudulent joinder analysis."). Nor are many of Defendants' merits arguments appropriate at this stage. *See Marker v. Chesapeake Life Ins. Co.*, No. 10-729, 2011 WL 2670004, at *2 n.1 (E.D. Pa. July 6, 2011) ("[Defendant's] arguments are more pertinent to a determination on the merits . . . rather than the issues addressed by the *Hensgens* test, and as such the Court does not consider those arguments relevant in its present analysis.").

Turning to the three-step Rule 21 analysis, and the ultimate issue of the proper remedial response to Plaintiff Hart's diversity-destroying misjoinder, the Court first considers Hart's dispensability. As the United States Court of Appeals for the Third Circuit has instructed, "A court's Rule 21 discretion is bounded by: (1) Rule 19, such that indispensable parties may not be dropped; and (2) Rule 21's own requirement that no party be prejudiced. If these prerequisites are satisfied, then district courts may guide their 'on just terms' discretion by looking to the factors delineated in *Hensgens*." *Avenatti*, 41 F.4th at 135 (quoting Fed. R. Civ. P. 21).

12

A.    DISPENSABILITY UNDER RULE 19

Under Rule 19(b), a party is indispensable if "in the circumstances of the case [the party] must be before the court." *Steel Valley Auth.*, 809 F.2d at 1011. This means "persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its leaving may be wholly inconsistent with equity and good conscience." *AC Ocean Walk*, 2023 WL 8802531, at *4 (quoting *Doolin v. Kasin*, 424 F. App'x 106, 110 n.4 (3d Cir. 2011)). "The factors for the court to consider include: (1) the extent to which a judgment rendered in the [party's] absence might prejudice that [party] or the existing parties; (2) the extent to which any prejudice could be lessened or avoided[;] . . . (3) whether a judgment entered in the [party's] absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b). If a party is indispensable within the meaning of Rule 19(b), but their joinder in the instant action is infeasible under Rule 19(a) because, as here, joinder would deprive the Court of jurisdiction, then "the case must continue with all parties present in a forum where jurisdiction and venue are proper as to the indispensable party." *In re Howmedica Osteonics Corp.*, 867 F.3d 390, 405 (3d Cir. 2017). "[T]he burden to prove dispensability lies with Defendants." *AC Ocean Walk*, 2023 WL 8802531, at *7.[9]

---

[9] Rule 19's compulsory joinder provisions first define when a party is "necessary" or "required," *see* Fed. R. Civ. P. 19(a), then when a party is "indispensable," *see* Fed. R. Civ. P. 19(b). *See also Pa. State Univ. v. Keystone Alts. LLC*, No. 19-2039, 2022 WL 4656666, at *2 n.3 (M.D. Pa. Sept. 30, 2022) (explaining that courts continue to use the terms "necessary" and "indispensable" in relation to Rule 19, notwithstanding that the current version of the Rule omits those terms and instead references "required" parties). The subsections overlap in substance, and "a party cannot be considered indispensable under Rule 19(b) without first meeting one of the grounds for necessity under Rule 19(a)." *Pa. State Univ.*, 2022 WL 4656666, at *6; *see Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 320 (3d Cir. 2007). Courts thus sometimes cite the Rule 19(a) guideposts when analyzing dispensability for Rule 21 purposes. *See, e.g., Route 27, LLC v. Getty Petroleum Mktg., Inc.*, No. 10-3080, 2011 WL 1256618, at *9 (D.N.J. Mar. 30, 2011). Courts likewise consider whether "complete relief" is possible in the absence of the misjoined party, using the

Hart is dispensable for purposes of Rule 19. Indeed, this action commenced without his participation, the parties bring some separate claims, and they assert differing (although overlapping) harm and damages. Chaykowsky and Westside can be afforded "adequate" relief for their injuries related to their desire to purchase the Property even in the absence of Hart, who asserts distinct injuries related to allegedly being duped into voting for the Ordinance and living near the rezoned Property.[10] Fed. R. Civ. P. 19(b)(3); *see Mortellite*, 460 F.3d at 494 (dismissing John Doe plaintiffs to preserve diversity jurisdiction and reasoning that John Does were dispensable because "the named plaintiffs can obtain complete relief without [their] presence"). True, for the reasons discussed below, "a judgment rendered in [Hart's] absence might prejudice" him as well as the other Plaintiffs. Fed. R. Civ. P. 19(b)(1). However, it cannot be said that "a final decree *cannot be made* without either affecting [Hart's] interest [in this controversy], or leaving the controversy in such a condition that its leaving may be *wholly inconsistent with equity and good conscience*." *AC Ocean Walk*, 2023 WL 8802531, at *4 (emphasis added).[11]

---

language of Rule 19(a)(1)(A) seemingly in place of the "adequate remedy" language in Rule 19(b)(3)–(4). *See Mortellite v. Novartis Crop Prot., Inc.*, 460 F.3d 483, 494 (3d Cir. 2006) (considering whether "complete relief" was possible without misjoined party); *Avenatti*, 41 F.4th at 135–36 (same).

[10] For the same reasons, Chaykowsky and Westside could likewise obtain "complete" relief without Hart, such that he is not "necessary" or "required" under Rule 19(a). *See supra* note 9.

[11] Plaintiffs' argument is well taken that the Rule 21 framework is in some ways a strange fit here. (*See, e.g.*, MTR at 10, 14.) While Rule 21, by its plain terms, grants district courts authority to dismiss misjoined "part[ies]," the Rule is generally applied when a nondiverse *defendant* has been joined, not a nondiverse plaintiff. *See Burdick v. Rosenthal Collins Grp., LLC*, No. 13-2553, 2013 WL 12619084, at *1–2 (N.D. Ill. Nov. 15, 2013) (collecting cases and explaining the relevance of this distinction). The case law reflects that distinction, including, for example, in that courts frequently focus on defendants' joint and several liability when considering dispensability. *See, e.g.*, *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 422 (3d Cir. 2010) (affirming dismissal of nondiverse defendant under Rule 21 and finding defendant dispensable where plaintiff alleged defendants' joint and several liability); *Avenatti*, 41 F.4th at 135–36 (same); *Gen. Refractories Co.*, 500 F.3d at 313–14 (finding that nondiverse insurers were not necessary or indispensable based on joint and several liability under insurance policies' contribution and indemnification clauses).

Because Rule 21 offers a discretionary and accommodating framework, the Court applies it here—and because the Court finds in Plaintiffs' favor that remand is appropriate, it need not ultimately decide whether this standard if any permits the dropping of a nondiverse plaintiff who was joined as of right post-removal.

14

## B.    PREJUDICE UNDER RULE 21

A dispensable party may be dropped using Rule 21 only if no party would be prejudiced by the dispensation. *See Avenatti*, 41 F.4th at 131. Factors relevant to this Rule 21 question include whether there are "significant[]" differences between "the issues sought to be tried separately," including with respect to their proofs, and whether each side would be prejudiced if the party is or is not dropped. *See Demarco v. DIRECTV, LLC*, No. 14-4623, 2015 WL 6525900, at *7 (D.N.J. Oct. 28, 2015).

Four counts in the AC are brought by all Plaintiffs. (AC ¶¶ 91–105, 114–22, 156–60.) The underlying facts, proofs, and law are shared and overlapping. *See Demarco*, 2015 WL 6525900, at *7 ("Should this case be severed, the questions of law would remain identical in both resulting actions, forcing the parties to answer these questions multiple times. . . . Therefore the Court finds that the issues will be similar enough for severance to be inappropriate."). Even those claims that are unique to Hart on the one hand, and Chaykowsky and Westside on the other, are still all fraud claims—with the sole exception of Chaykowsky and Westside's tortious interference claim. (AC ¶¶ 106–13, 123–55, 161–66.) These claims stem from the same facts, namely BMS and JLL's "fraudulent scheme" to hide Westside's offer in order to get the Property rezoned. (Reply at 6 ("[T]he facts are so common to the three Plaintiffs' claims that, if [Plaintiffs' counsel] were

---

To the extent some courts suggest remand is the necessary next step in light of the present posture, Rule 21 at least offers Defendants a chance at the outcome they seek. *Cf. Ferry v. Bekum Am. Corp.*, 185 F. Supp. 2d 1285, 1289–92 (M.D. Fla. 2002) (rejecting defendants' argument that Rule 21 should be applied to drop nondiverse plaintiff from case removed without complete diversity and reasoning that "[a]bsent a showing of fraudulent or egregious joinder, the Court is obligated to remand," *id.* at 1291, and lacks authority to "drop[] a nondiverse *plaintiff, over the plaintiff's objection*, in order to retain (or create) subject matter jurisdiction," *id.* at 1289); *Baker v. Tri-Nations Express, Inc.*, 531 F. Supp. 2d 1307, 1317 (M.D. Ala. 2008) (same with respect to nondiverse cross-plaintiff). *But cf. Mortellite*, 460 F.3d at 494 (dismissing John Doe plaintiffs under Rule 21 to preserve diversity jurisdiction); *Route 27*, 2011 WL 1256618, at *8–10 (finding no fraudulent joinder where nondiverse plaintiffs were joined pre-removal, then proceeding to apply Rule 21 to conclude that nondiverse plaintiffs should not be dropped and case should be remanded); *AC Ocean Walk*, 2023 WL 8802531, at *5–7 (similar).

15

compelled to re-file Hart's claims in state court, Hart's complaint would contain the same 25-page factual recitation that appears in the Complaint before this Court.").) Thus, "[s]ome version of [the same facts] would necessarily be placed before the fact finder, whether in joint or severed proceedings." *Est. of Grieco by Grieco v. Nat'l Med. Consultants, P.C.*, No. 16-1959, 2021 WL 1248533, at *6 (D.N.J. Apr. 5, 2021) (quoting *Gonzalez v. New Jersey*, No. 14-07932, 2019 WL 291162, at *4 (D.N.J. Jan. 23, 2019)). In turn, relevant "witnesses and . . . documentary proof" would overlap. *Demarco*, 2015 WL 6525900, at *7; *see id.* at *8 ("[T]he questions of law would require similar enough witnesses for the Court to keep the case joined."). Given that "the pertinent facts" in all three Plaintiffs' separate claims are "clearly interrelated," the "factual analysis is therefore much more appropriately done jointly." *Twin City Fire Ins. Co. v. Ovation Fund Servs., LLC*, No. 18-14944, 2019 WL 1275060, at *3 (D.N.J. Mar. 20, 2019).

The respective prejudice to the parties also weighs against dropping Hart and in favor of remand. The prejudice to Plaintiffs perhaps most obviously includes litigating common claims and facts in two different courts. *Cf. Demarco*, 2015 WL 6525900, at *8 ("The potential prejudice to the Plaintiffs arises from the possibility of being forced to litigate essentially the same case twice, thereby conducting twice as much discovery as necessary, and incurring twice the expense."); *Bayonne Med Realty, LLC v. Citizens Ins. Co. of Am.*, No. 08-1004, 2008 WL 2945970, at *4 (D.N.J. July 30, 2008) ("Plaintiff will suffer prejudice in the form of economic burden if it is required to maintain two separate actions . . . [and] required to litigate two cases involving intersecting sets of facts, documents and issues in two different forums."); *cf. also Marker*, 2011 WL 2670004, at *4 n.6 ("The Court notes that [Defendant] also would have to bear the costs of two actions. And, of course, the overall judicial system would be devoting the resources of two courts to essentially the same dispute." (citing *Kahhan v. Mass. Cas. Ins. Co.*, No. 01-1128, 2001

16

WL 1454063, at *3 (E.D. Pa. Nov. 14, 2001))).[12] Having two separate cases on dual tracks with clearly overlapping factual allegations not only creates duplicative litigation expenses but also, without question, presents a real risk of inconsistent rulings and unnecessarily expends judicial resources, as elaborated upon hereinbelow.

What is more, Hart's dismissal would severely hinder if not preclude his ability to renew his fraud claims in state court. *See DirecTV, Inc. v. Leto*, 467 F.3d 842, 846–47 (3d Cir. 2006) ("Because a dismissal improperly would have imposed adverse statute-of-limitations consequences on [Plaintiff], we hold that the District Court would have abused its discretion in choosing dismissal as a misjoinder remedy."). By Plaintiffs' own admission, those claims would be untimely under the applicable six-year statute of limitations. (MTR at 10–11.) It is possible that the statute of limitations problem could be avoided by the severance of Hart's claims, as opposed to the dismissal of Hart as a party. *See DirecTV*, 467 F.3d at 847 n.4 ("We are duty-bound to sever claims rather than dismiss defendants if a dismissal would bring statute of limitations consequences." (citation omitted)). However, severance would not prevent burdensome and unwieldy parallel litigation involving the same issues and several of the same claims. *See High 5 Games, LLC v. Marks*, No. 13-7161, 2019 WL 3761114, at *12 n.13 (D.N.J. Aug. 9, 2019) (explaining that the Third Circuit has "caution[ed] against severing claims if the partial transfer would require the same issues to be litigated in two places"); *cf. Edge v. Rice Drilling D, LLC*, No.

---

[12] The Court notes that *Demarco*, *Bayonne*, and *Marker* concerned the more typical question of the proper remedial response to misjoinder of a nondiverse *defendant*, and thus addressed the prejudice that plaintiffs would face from personally litigating the same case in multiple courts. That prejudice is of a different nature here to the extent each Plaintiff is unlikely to feel the *financial* burden of the parallel case and would only have to personally litigate their own claims in one forum. This distinction speaks to Plaintiffs' argument, *see supra* note 11, that the Rule 21 framework and case law may be an imperfect fit here. Even so, these cases and others support that the prejudice caused by parallel litigation stemming from common facts is not so narrow and includes not only economic but also legal prejudice—*inter alia* the statute of limitations barrier and risk of inconsistent rulings elaborated upon in the next paragraphs.

24-4136, 2025 WL 2601922, at *4 (S.D. Ohio Sep. 9, 2025) (concluding, in the context of a case that was removed without complete diversity, that "[t]he sever and remand sought here would not simply separate unrelated claims against unrelated defendants" but would "fragment" the plaintiff's "claims alleging that the diverse and nondiverse defendants engaged in a joint venture giving rise to the claims, including trespass, unjust enrichment, conversion, and declaratory judgment"). Any outcome that results in Hart proceeding separately in state court also poses the concerning risk of inconsistent rulings. *See Marker*, 2011 WL 2670004, at *5 ("[T]he litigation of two cases in different forums involving essentially the same set of facts, evidence, and legal issues, raises the potential for inconsistent rulings . . . ."); *City of Perth Amboy v. Safeco Ins. Co. of Am.*, 539 F. Supp. 2d 742, 749 (D.N.J. 2008) ("[A]lthough Plaintiff could bring a separate suit against [non-diverse defendant] in state court, . . . there is a genuine risk of conflicting findings and rulings.").[13]

By contrast, the prejudice Defendants would suffer if Hart is not dropped from this case, such that the case is remanded, is being forced to litigate this matter in Plaintiffs' chosen forum of state court and refiling, if they so chose, the Motions to Dismiss presently pending before this Court. However, "the fact that [Defendants] will have to litigate state claims in state court does not amount to prejudice." *Walborn v. Gen. Nutrition Corp.*, No. 91-3937, 1991 WL 149846, at *1 (E.D. Pa. July 29, 1991); *see City of Perth Amboy R&R*, 539 F. Supp. 2d at 754 ("Defendant will not suffer any prejudice from litigating state law claims in a state forum."). Nor does the refiling of Defendants' Motions constitute prejudice weighing against remand (especially not where, as

---

[13] The case citation at *City of Perth Amboy v. Safeco Ins. Co. of Am.*, 539 F. Supp. 2d 742 (D.N.J. 2008), contains both a Report and Recommendation ("R&R"), *see id.* at 751–55, and the Opinion adopting that R&R, *see id.* at 745–51. The Court primarily cites the Opinion adopting the R&R ("*City of Perth Amboy*") and when citing the R&R uses the case name "*City of Perth Amboy R&R*."

18

here and as elaborated below, Defendants could have waited for the Court to decide the Motion to Remand before moving to dismiss). Defendants do not otherwise identify prejudice they would suffer should Hart remain in this case and the matter be remanded.

Ultimately, the Court finds that dropping Hart from this case would prejudice Plaintiffs, including because Hart faces what appears to be a bona fide statute of limitations barrier with respect to at least four of his claims and because of the risks that follow from parallel litigation involving common claims, facts, and discovery, including the risk of inconsistent rulings.

### C.    *HENSGENS* FACTORS

Having determined that Hart is dispensable but that prejudice would result for Plaintiffs if Hart were dropped from this case, the Court finally turns to the third step under Rule 21: whether Hart's dismissal would be "just." *See* Fed. R. Civ. P. 21. "[B]ecause Rule 21 does not contain explicit standards governing . . . what constitutes 'just terms' . . . courts sometimes 'must incorporate standards to be found elsewhere' in exercising their Rule 21 discretion." *Avenatti*, 41 F.4th at 131. In the Third Circuit, "district courts may guide their 'on just terms' discretion by looking to the factors delineated in *Hensgens* [*v. Deere & Co.*]" in the context of a diversity-destroying motion to amend in a removal action. *Id.* at 135. Restated for purposes of a remand decision following an amendment as of right, the four *Hensgens* factors are (i) whether the purpose of the diversity-destroying amendment was indeed to defeat federal jurisdiction, (ii) whether the plaintiff was dilatory in making the amendment, (iii) whether the plaintiff would be prejudiced by dismissal of the nondiverse party, and (iv) "any other factors bearing on the equities." *See id.* at 129 (quoting *Hensgens*, 833 F.2d at 1182).

"The first *Hensgens* factor is an examination of the extent to which defeating Defendant's choice in the federal forum was the purpose of Plaintiff's decision to add the non-diverse party,

*i.e.* plaintiff's motive." *City of Perth Amboy*, 539 F. Supp. 2d at 746. The motive behind joinder of a nondiverse party is a fact-specific inquiry. *Id.*; *see id.* at 746–47 (noting that courts may consider "[t]he parties' actions during the period between the filing of the complaint and the motion to amend"). The "sequence of events" is one way to gauge illicit motive behind a diversity-destroying amendment. *See Avenatti*, 41 F.4th at 135.

Here, at first blush, the sequence of events appears dubious. BMS removed this case on March 17, 2025. (ECF No. 1.) After Defendants stated their plan to move to dismiss, (ECF Nos. 22, 24, 25), Plaintiffs' counsel filed a letter representing his intent to amend the initial complaint "to address the deficiencies alleged in Defendants' letters," (ECF No. 26 at 1). No mention was made that he would be adding a new Plaintiff let alone that the amendment would leave this Court without federal jurisdiction over the case before it. The AC was filed on May 25, 2025, adding Hart and destroying complete diversity. (*See* AC.) Plaintiffs' counsel further concedes that he had knowledge of Hart prior to filing the initial complaint. (MTR at 12.) Allegations therein reference "a committee member" who "expressed his concerns with the Ordinance" and was ultimately "deceived into voting to pass the Ordinance," and the AC reveals that anonymous "committee member" was Hart. (ECF No. 1-1 at ¶¶ 61–62; *see* AC ¶ 80 ("Plaintiff Hart was thus deceived into voting to pass the Ordinance.").) When a nondiverse defendant is added under such circumstances, it often supports that the purpose of amendment was "to induce remand." *See Petricorena v. Walmart Inc.*, No. 24-10965, 2025 WL 2650574, at *4 (D.N.J. Sep. 16, 2025) ("Plaintiff's awareness of [defendant]'s identity pre-removal—indeed, *pre-suit*—without seeking to name her as a defendant until immediately after removal strongly indicates that the amendment is designed to induce remand."); *Avenatti*, 41 F.4th at 135 ("[T]he fact that [the plaintiff] discussed [the later-

20

added nondiverse defendant] in the initial complaint without naming him as a defendant also supported a finding of improper purpose.").

However, this is not a case where "plaintiff has failed to provide any credible explanation" for the diversity-destroying amendment. *Petricorena*, 2025 WL 2650574, at *4. To the contrary, Plaintiffs' counsel provided a thorough and illuminating certification in support of the Motion to Remand, ("MTR Cert.," ECF No. 81-2), explaining that, although he was "aware of Hart's involvement with the matter" and "always intended to amend" the initial complaint, he had not yet been retained by Hart at the time of the filing, and he could not wait to commence suit because of the risk that Chaykowsky's claims would become time barred by the six-year statute of limitations,[14] (*id.* ¶¶ 4, 7–8; *see id.* ¶ 7 ("Had I been so retained, I obviously would have included [Hart's] claims in the initial Complaint . . . .")). Plaintiffs' counsel thus filed the initial complaint to "stop the clock" on the statute of limitations. (*Id.* ¶ 4.) Counsel further explained that his letter expressing his intent to amend could not have previewed that he would be adding a nondiverse party because "it was only after [Plaintiffs' counsel] began drafting the First Amended Complaint . . . that John Hart separately retained [Plaintiffs' counsel] to pursue his own claims arising out of the same underlying facts." (*Id.* ¶ 9.) Counsel certified: "The truth is that John Hart came to me with his own claims arising from the same fraudulent scheme; I investigated his claims and found them to be meritorious – as well as factually intertwined with the other Plaintiffs' claims – and so I added them to the case." (*Id.* ¶ 11.) The Court finds Plaintiffs' counsel's explanation reasonable. *See City of Perth Amboy R&R*, 539 F. Supp. 2d at 753 ("There is no doubt that Plaintiff was aware that [the nondiverse defendant] existed at the time it filed its complaint. However, this

---

[14] According to Plaintiffs' counsel, Chaykowsky's claims could have become time barred on June 24, 2025, six years after the Township meeting at which the Ordinance was passed. (MTR Cert. ¶ 4.)

21

knowledge does not necessarily equate with improper motive."); *City of Perth Amboy*, 539 F. Supp. 2d at 746 n.2 ("[T]his Court cannot conclude, as Defendant urges, that mere awareness of a non-diverse party prior to the filing of the Complaint combined with a failure to include that party in the original complaint demonstrates a *per se* intent to defeat diversity.").

This is also not a case where counsel was aware of a nondiverse *defendant*'s wrongdoing and declined to name the defendant in a pleading until after removal. *See, e.g.*, *Avenatti*, 41 F.4th at 135. Because it was BMS that removed this case to federal court, Plaintiffs' counsel essentially had no control over the timing of Hart's addition in this case. "The fact that plaintiff was unable to effect the substitution before [defendant] removed does not somehow convert any subsequent effort at substitution into a joinder for the sole purpose of destroying diversity." *Gilberg v. Stepan Co.*, 24 F. Supp. 2d 355, 358 (D.N.J. 1998) (internal quotation marks omitted). Nor can it be said that the complaint was amended "immediately after removal," as though solely to achieve remand by adding an already known party who would destroy diversity jurisdiction. *See Avenatti*, 41 F.4th at 135 ("Especially where, as here, a plaintiff seeks to add a nondiverse defendant immediately after removal but before any additional discovery has taken place, district courts should be wary that the amendment sought is for the specific purpose of avoiding federal jurisdiction." (quoting *Mayes*, 198 F.3d at 463)). The timeline here indeed supports Plaintiffs' counsel's explanation that he was retained only after the case was removed and while he was drafting the AC. His explanation also supports that Plaintiffs' "primary intent in adding non-diverse parties is not the destruction of diversity but, rather, efficiency . . . [and] that joining these parties and including these claims will allow for a more efficient resolution of the various disputes." *Bayonne*, 2008 WL 2945970, at *3.

In sum, while the timing of Hart's addition to this case at first appears suspect, Plaintiffs appear to have had "a legitimate reason for failing to name" Hart in the initial complaint and

"should not be prohibited from adding him at this time." *Agostino v. Costco Wholesale Corp.*, No. 19-8976, 2019 WL 6080242, at *4 (D.N.J. June 24, 2019), *report and recommendation adopted*, 2019 WL 6050746 (D.N.J. Nov. 7, 2019); *see id* at *3–5 (granting plaintiffs' motion to amend and remand and relying on plaintiffs' attorney's certification to conclude, *inter alia*, that plaintiffs had "a legitimate reason for failing to name" nondiverse defendant in pre-removal complaint); *Bayonne*, 2008 WL 2945970, at *4 (crediting plaintiff's attorney's certification in support of motion to remand and finding explanations therein persuasive as to *Hensgens* factors); *cf. Edmondson v. Lilliston Ford*, No. 13-7704, 2014 WL 12908946, at *2 (D.N.J. Mar. 26, 2014) (reasoning, based on Federal Rule of Civil Procedure 11, that "reliance on [an attorney] certification is generally well-founded"); *Comcast Cable Commc'ns v. Adubato*, 367 F. Supp. 2d 684, 695 (D.N.J. 2005) ("The court is accustomed to relying upon the attorneys who appear before them, and rarely is that reliance misplaced.").

The second *Hensgens* factor is dilatoriness. Whether a plaintiff was dilatory in adding a nondiverse party "turns on 'the length of time'" between the initial complaint, removal, and amendment, "as well as the nature of the delay." *Maier Solar Eng'g, LLC v. Wells Fargo, NA*, No. 21-13292, 2022 WL 884367, at *4 (D.N.J. Mar. 25, 2022) (quoting *City of Perth Amboy*, 539 F. Supp. 2d at 748). "[A] plaintiff's conduct may be found dilatory when the purpose of the delay was to unnecessarily prolong litigation." *City of Perth Amboy*, 539 F. Supp. 2d at 748. Defendants do not appear to argue that Plaintiffs were dilatory in asking for amendment, and it does not appear to the Court that there would be any basis for them to do so. Plaintiffs were within the time set out by Rule 15(a) to amend as of right, and Plaintiffs filed such an amendment within two months of this case being removed to federal court, prior to any responsive pleadings being filed. Those two months were also not idle time; numerous docket entries reflect a litany of notices of appearance,

23

requests for additional time by Defendants, and multiple letters by Defendants' counsel seeking a pre-motion conference. (*See, e.g.*, ECF Nos. 10, 11, 12, 13, 18, 19, 20, 21, 22, 24, 25.) "Considering the overall sequence as well as the length of time that has lapsed," it does not appear that Plaintiffs were dilatory in seeking to amend the initial complaint. *Knox v. Walmart, Inc.*, No. 24-9447, 2025 WL 1952647, at *4 (D.N.J. July 15, 2025).

Under the third *Hensgens* factor, the Court considers whether Plaintiffs would be "significantly injured" if the nondiverse party is dropped. *Avenatti*, 41 F.4th at 129 (quoting *Hensgens*, 833 F.2d at 1182). As explained hereinabove, "there is some prejudice to Plaintiff[s], in the form of increased costs and potential for inconsistent rulings, that results if" Hart is excluded from this suit. *City of Perth Amboy*, 539 F. Supp. 2d at 749. Not only do Chaykowsky, Westside, and Hart share claims (Counts 1, 2, 4, and 9 of the AC) but also their individual claims derive from a common factual nucleus. Accordingly, "there is a genuine risk of inefficiencies, increased costs, and inconsistent rulings." *Knox*, 2025 WL 1952647, at *4. The Court incorporates its above analysis with respect to prejudice to Plaintiffs and finds that this factor weighs in favor of remand.

Finally, there are several equitable factors that support remand. "[U]]nder the fourth *Hensgens* factor, the Court weighs equitable considerations, such as judicial economy and efficiency." *Id.* Judicial economy is plainly served by Plaintiffs litigating in one joined proceeding. *See id.* ("[C]ompelling a plaintiff to pursue parallel actions in state and federal court is a waste of judicial resources."); *City of Perth Amboy*, 539 F. Supp. 2d at 749 ("It would be a waste of judicial resources to allow two separate proceedings."); *see also Gilberg*, 24 F. Supp. 2d at 358–59 ("No discovery has been taken by either party and no answer has been filed. Indeed, the only significant activity has involved motion practice on the issue of remand. In contrast, if joinder is disallowed, plaintiff will be forced to pursue parallel actions in State and federal court, resulting in a clear

24

waste of judicial resources."). Moreover, state court offers a better forum given that all of Plaintiffs' claims involve the application of state law.[15] *City of Perth Amboy*, 539 F. Supp. 2d at 749; *cf. Carter v. Dover Corp.*, 753 F. Supp. 577, 580 (E.D. Pa. 1991) ("The case involves exclusively state law issues. The alternative to joinder is the litigation of separate suits with an attendant inefficient use of judicial resources. The most logical, economical and equitable approach is to determine the respective rights and liabilities of all relevant parties *inter se* in one proceeding. . . . Accordingly, plaintiff's motions [to amend and add nondiverse defendant and to remand] will be granted."). As another court in this District put it:

> Given that Plaintiff[s] amended [their] complaint to add [the nondiverse party] in the early stages of this litigation (within two months of removal and before any scheduling order was entered limiting the time within which to join additional parties) and there being no evidence or argument that [Hart] was added by Plaintiff in an attempt to 'forum shop' or thwart this Court's jurisdiction, the Court sees no compelling reason to believe that such joinder was inequitable or not in the interests of justice, especially when having the claims . . . arising from the same transaction decided in the same action would promote judicial economy and prevent duplicative litigation.

*New Heights Logistics, LLC v. Penske Leasing & Rental Co.*, No. 22-738, 2023 WL 3043864, at *5 (D.N.J. Apr. 21, 2023) (footnote omitted).

Defendants' proposed factors do not support the conclusion that dropping Hart is the just outcome here. Defendants first assert that "they were never informed that an additional non-diverse Plaintiff would be added to the Amended Complaint" and that, "[i]f Plaintiffs had made Defendants so aware, they may not have consented to the agreed upon briefing schedule, given the

---

[15] Defendants assert that "[w]hether or not the plaintiff's claims are state law-related is irrelevant." (Opp. at 19.) To the contrary, courts have considered the state law nature of a plaintiff's claims at both the second and third steps of the Rule 21 analysis, and the Court does the same here. *See, e.g., City of Perth Amboy R&R*, 539 F. Supp. 2d at 754 (reasoning, at second step, that "Defendant will not suffer any prejudice from litigating state law claims in a state forum"); *City of Perth Amboy*, 539 F. Supp. 2d at 749 (concluding same at third step, specifically under fourth *Hensgens* factor of equitable considerations); *Bayonne*, 2008 WL 2945970, at *5 (same).

time and resources required to file motions to dismiss which may be moot if this Court decides to grant the instant motion for remand."[16] (Opp. at 18–19.) However, as explained, Plaintiffs' counsel offers a reasonable explanation for not advising Defendants about Hart at that juncture: counsel had not yet been formally retained by Hart. (*See* MTR Cert. ¶¶ 7, 9; Reply at 8.) Nor was it inequitable for Plaintiffs' counsel to decline to proactively volunteer that information, as the complaint was amended as of right. *Cf. New Heights Logistics, LLC*, 2023 WL 3043864, at *4 ("[Defendant] makes much of the fact that the consent order that allowed Plaintiff to file its Amended Complaint 'did not specifically allow plaintiff to add an additional party'; by that same token, however, the consent order that [Defendant] agreed to and jointly presented to the Court did not expressly limit in any way the amendments that Plaintiff could make to its complaint . . . ." (citations omitted)). The "time and resources" expended on Defendants' Motions to Dismiss do not alter this analysis. After Plaintiffs filed the AC, Defendants renewed their requests to file motions to dismiss, and Plaintiffs filed a letter as to their intent to move to remand. (ECF Nos. 38, 43, 44, 45, 64.) Defendants at that point could have agreed that the remand issue be decided first, with their responsive pleading deadlines held in further abeyance. (*See* ECF No. 67.) Plaintiffs state they "would have of course agreed to a briefing schedule where the motion to remand was briefed and decided first (it *should* be decided first); it was the Defendants who insisted on the issues being heard together." (Reply at 9; ECF No. 70.) Moreover, Defendants' time and resources were not wasted, as their Motions will presumably be of use in state court should Defendants wish to refile.

---

[16] Defendants also protest that they were not informed that Hart would be added to the AC "despite giving consent to its filing." (Opp. at 18.) However, such consent was not required, as Plaintiffs were permitted to amend as of right under Rule 15(a)(1).

Defendants also contend that the out-of-state Defendants face "local bias" in state court. (Opp. at 19 (quoting *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 111 (1945)).) "Although the Court is sensitive to the role of diversity jurisdiction in protecting non-citizen defendants from any potential local prejudice in state court, this sensitivity is inherent in the Court's balancing of the defendant's interest in remaining in the federal forum with the competing interest in eschewing parallel cases." *City of Perth Amboy*, 539 F. Supp. 2d at 749–50. Furthermore, while "diversity jurisdiction exists because of a fear that the state tribunal would be prejudiced towards the out-of-state plaintiff or defendant, that concern is understandably allayed when that party is joined with a citizen from the forum state. Indeed, when members from the forum state are present on both sides of the controversy, it becomes more difficult to imagine that a state tribunal would favor one side based upon biases in favor of its own citizens." *Dresser Indus., Inc. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 499 (3d Cir. 1997); *cf. In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 67 F. Supp. 3d 952, 957 (N.D. Ill. 2014) ("In a case like this one where at least one of the multiple defendants named is a citizen of the forum state, . . . the likelihood of local bias against all defendants is too attenuated to justify removal.").

Defendants lastly argue that "a conflict of interest would arise from Hart's participation in this matter" but fail to explain how this purported conflict of interest is relevant to the Court's remand decision or the equities of Hart's excision. (Opp. at 20.) Defendants simply assert that "the Court should consider" this purported conflict and cite inapposite cases concerning whether a local official had a disqualifying conflict of interest that rendered invalid the municipal decision or ordinance that resulted from the official's participation. (*See id.*) However, Defendants' "arguments are more pertinent to a determination on the merits . . . rather than the issues addressed by the *Hensgens* test, and as such the Court does not consider those arguments relevant in its

present analysis." *Marker*, 2011 WL 2670004, at *2 n.1; *see Confessore v. AGCO Corp.*, No. 14-7262, 2015 WL 4430472, at *6 n.6 (D.N.J. July 20, 2015) ("[T]he Court is not conducting a Rule 12(b)(6) analysis, and therefore need not consider the merits of Plaintiff's individual claims."). "Furthermore, even assuming that improper conduct by [Hart] was an appropriate equitable factor for consideration, Defendant[s'] mere speculation of impropriety is not sufficient to factor into the Court's equitable analysis." *City of Perth Amboy*, 539 F. Supp. 2d at 750.

In sum, having concluded at step two of the Rule 21 analysis that dropping Hart from this suit would prejudice Plaintiffs but not Defendants, the Court concludes under the *Hensgens* factors at the third and final step that dropping Hart would not be just. "There has been no undue delay or prejudice and the Court is satisfied that the primary purpose of the amendment [was] not to defeat federal jurisdiction. Finally, judicial economy strongly favors joinder and remand." *Id.* at 749. Accordingly, the Court lacks subject matter jurisdiction over this case, and it must be remanded in its entirety to state court.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Remand (ECF No. 81) is **GRANTED**, and Defendants' Motions to Dismiss (ECF Nos. 72, 73, 74) are **DENIED** as moot. An appropriate Order will accompany this Opinion.

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: February 26, 2026